The Honorable David G. Estudillo

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

LUDLOW EXCHANGE, LLC d/b/a NOVIG,

Plaintiff,

v.

NICHOLAS W. BROWN, in his official capacity as Attorney General for the State of Washington; TINA GRIFFIN, in her official capacity as Executive Director of the Washington State Gambling Commission; SARAH LAWSON, in her official capacity as Chair of the Washington State Gambling Commission; ALICIA LEVY, in her official capacity as Vice Chair of the Washington State Gambling Commission; NOAH SKARTVEDT and MICHAEL CHARLES, in their official capacities as Commissioners of the Washington State Gambling Commission,

Defendants.

No. 3:26-cv-05888-DGE

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

NOTE ON MOTION CALENDAR: November 16, 2026



**BRADLEY BERNSTEIN SANDS LLP**
2800 First Avenue, Suite 326
Seattle, WA 98121
Tel: (206) 337-6551

## TABLE OF CONTENTS


Page

**PRELIMINARY STATEMENT** ........ 1

**FACTUAL BACKGROUND** ........ 3

A. Novig Built A Federally Regulated Exchange, Not A Sportsbook ........ 3

B. Congress Gave The CFTC Exclusive Jurisdiction Over Swaps Traded On DCMs ........ 5

C. The CFTC's October 2026 Interim Final Rule And Notice Of Proposed Rulemaking ........ 6

D. Washington Has Declared Event Contracts Illegal And Sued A DCM ........ 7

E. *Assad* And The Denial Of Rehearing En Banc ........ 7

F. Defendants Filed A Motion To Dismiss Two Months After Novig's Complaint ........ 8

**LEGAL STANDARD** ........ 9

**ARGUMENT** ........ 10

I. THE MOTION IS UNTIMELY, AND DEFENDANTS' REVERSAL UNDERCUTS ANY CLAIM OF URGENCY ........ 10

II. *ASSAD* DOES NOT REQUIRE DISMISSAL OF NOVIG'S COMPLAINT ........ 11

A. *Assad* Decided Only That Kalshi Had Not Shown A Likelihood Of Success On A Preliminary-Injunction Record ........ 11

B. *Assad's* Swap Holding Rested On A Regulation The CFTC Is About To Replace ........ 13

C. The CFTC's October 2026 Rulemakings Supply The Limiting Principle *Assad* Found Lacking ........ 14




**BRADLEY BERNSTEIN SANDS LLP**
2800 First Avenue, Suite 326
Seattle, WA 98121
Tel: (206) 337-6551

D. *Assad* Confirms That Section 2(a)(1)(A) Is An Express Preemption Provision ... 16

III. THE UNSETTLED STATE OF THE LAW COUNSELS AGAINST DISMISSAL WITH PREJUDICE ... 17

IV. THE COMPLAINT STATES A PLAUSIBLE PREEMPTION CLAIM ... 19

A. The Complaint Plausibly Alleges Express Preemption ... 19

B. The Special Rule Confirms That Event Contracts Involving Gaming Fall Within The CFTC's Jurisdiction ... 20

C. The Complaint Plausibly Alleges Field And Conflict Preemption ... 21

V. ALTERNATIVELY, ANY DISMISSAL SHOULD BE WITHOUT PREJUDICE AND WITH LEAVE TO REPLEAD ... 22

A. Any Dismissal Should Be Without Prejudice ... 22

B. The Court Should Grant Leave To Amend ... 22

**CONCLUSION** ... 24



**BRADLEY BERNSTEIN SANDS LLP**
2800 First Avenue, Suite 326
Seattle, WA 98121
Tel: (206) 337-6551

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ahanchian* v. *Xenon Pictures, Inc.*,
624 F.3d 1253 (9th Cir. 2010) .......... 10

*Ashcroft* v. *Iqbal*,
556 U.S. 662 (2009) .......... 9

*Bell Atl. Corp.* v. *Twombly*,
550 U.S. 544 (2007) .......... 9

*Coinbase Fin. Mkts., Inc.* v. *Raoul*,
2026 WL 2969682 (N.D. Ill. Oct. 2, 2026) .......... 20

*Davidson* v. *Kimberly-Clark Corp.*,
889 F.3d 956 (9th Cir. 2018) .......... 9

*Doe I* v. *Nestle USA, Inc.*,
766 F.3d 1013 (9th Cir. 2014) .......... 3

*Eminence Cap., LLC* v. *Aspeon, Inc.*,
316 F.3d 1048 (9th Cir. 2003) .......... 22

*Flaherty* v. *KalshiEX, LLC*,
No. 26-299 (U.S. filed Sept. 2, 2026) .......... 3, 18–19

*Foman* v. *Davis*,
371 U.S. 178 (1962) .......... 22

*KalshiEX, LLC* v. *Assad*,
190 F.4th 1098 (9th Cir. 2026) .......... 1–3, 7, 9, 11–19, 21–23

*KalshiEX LLC* v. *Flaherty*,
172 F.4th 220 (3d Cir. 2026) .......... 16–17, 20–21



**BRADLEY BERNSTEIN SANDS LLP**
2800 First Avenue, Suite 326
Seattle, WA 98121
Tel: (206) 337-6551

*KalshiEX LLC* v. *Johnson*,
832 F. Supp. 3d 954 (D. Ariz. 2026) ........ 19
*KalshiEX LLC* v. *Orgel*,
2026 WL 474869 (M.D. Tenn. Feb. 19, 2026) ........ 19
*KalshiEX LLC* v. *Schuler*,
2026 WL 2884087 (6th Cir. Sept. 25, 2026) ........ 6, 16–17, 19
*Khoja* v. *Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) ........ 4
*Loper Bright Enters.* v. *Raimondo*,
603 U.S. 369 (2024) ........ 15
*N. Am. Derivatives Exch., Inc.* v. *Brown*,
No. 2:26-cv-02579, Dkt. 20 (W.D. Wash. Aug. 27, 2026) ........ 9, 11
*N. Am. Derivatives Exch., Inc.* v. *Nevada*,
No. 26-344 (U.S. filed Sept. 11, 2026) ........ 3, 19
*N. Am. Derivatives Exch., Inc.* v. *Nevada ex rel. Nev. Gaming Control Bd.*,
815 F. Supp. 3d 1169 (D. Nev. 2025) ........ 19
*Navarro* v. *Block*,
250 F.3d 729 (9th Cir. 2001) ........ 9
*Pulsifer* v. *United States*,
601 U.S. 124 (2024) ........ 21
*Robinhood Derivatives, LLC* v. *Dreitzer*,
No. 26-338 (U.S. filed Sept. 10, 2026) ........ 18
*Robinhood Derivatives, LLC* v. *Griffin*,
No. 3:26-cv-05311, Dkt. 17 (W.D. Wash. May 21, 2026) ........ 9, 11
*Seven Cnty. Infrastructure Coal.* v. *Eagle Cnty.*,
605 U.S. 168 (2025) ........ 16



**BRADLEY BERNSTEIN SANDS LLP**
2800 First Avenue, Suite 326
Seattle, WA 98121
Tel: (206) 337-6551

*United States* v. *Minnesota*,
2026 WL 2150211 (D. Minn. July 27, 2026) .......... 20
*Univ. of Tex.* v. *Camenisch*,
451 U.S. 390 (1981) .......... 12
*Vasquez* v. *Los Angeles Cnty.*,
487 F.3d 1246 (9th Cir. 2007) .......... 9, 23

**Statutes and Regulations**

7 U.S.C. § 1a(9) .......... 20
7 U.S.C. § 1a(47)(A)(i) .......... 5, 7, 15, 23
7 U.S.C. § 1a(47)(A)(ii) .......... 5, 7–8, 15
7 U.S.C. § 1a(47)(A)(iv) .......... 5, 7, 15, 20, 23
7 U.S.C. § 2(a)(1)(A) .......... 5, 16, 19
7 U.S.C. § 5(a) .......... 21
7 U.S.C. § 7a-2(c)(5)(C) .......... 5, 20
15 U.S.C. § 8302(d)(1) .......... 2, 5, 16
31 U.S.C. § 5362(1)(E)(ii) .......... 20
44 U.S.C. § 1507 .......... 23
Wash. Rev. Code § 9.46.0237 .......... 20
17 C.F.R. § 38.151(b) .......... 22
17 C.F.R. § 40.11 .......... 1, 5, 8, 13–14, 17–18, 23

**Rules**

Fed. R. Civ. P. 6(a)(1) .......... 10
Fed. R. Civ. P. 6(b) .......... 10–11
Fed. R. Civ. P. 12(a)(1)(A)(i) .......... 8, 10
Fed. R. Civ. P. 12(b) .......... 10–11
Fed. R. Civ. P. 12(b)(6) .......... 9–10



**BRADLEY BERNSTEIN SANDS LLP**
2800 First Avenue, Suite 326
Seattle, WA 98121
Tel: (206) 337-6551

Fed. R. Civ. P. 12(h)(2) .......... 10

Fed. R. Civ. P. 15(a) .......... 9, 22

Sup. Ct. R. 13.3 .......... 18

W.D. Wash. LCR 7(j) .......... 10

W.D. Wash. LCR 10(g) .......... 10

**Other Authorities**

120 Cong. Rec. 30,464 (1974) .......... 5

89 Fed. Reg. 48,968 (2024) .......... 16

Christopher J. Kirkpatrick, DCM Impartial Access Requirements, CFTC (Nov. 5, 2026) .......... 22

Further Definition of "Swap" to Exclude Casino-Style Gambling Products, 91 Fed. Reg. 65,969 (Oct. 19, 2026) .......... 2, 6, 14–16, 23

Further Definition of "Swap"—Inclusions, 91 Fed. Reg. 66,022 (proposed Oct. 19, 2026) .......... 2, 6–7, 14–15, 20–21, 23

Ludlow Exchange, LLC, Self-Certification of Rule Amendments Establishing Responsible Trading Standards (Aug. 12, 2026) .......... 4

Prediction Markets; Public Interest Determinations, 91 Fed. Reg. 35,806 (proposed June 12, 2026) .......... 5–6, 13



**BRADLEY BERNSTEIN SANDS LLP**
2800 First Avenue, Suite 326
Seattle, WA 98121
Tel: (206) 337-6551

Plaintiff Ludlow Exchange, LLC d/b/a Novig ("Novig") respectfully submits this memorandum in opposition to the motion to dismiss filed by Defendants Nicholas W. Brown, Tina Griffin, Sarah Lawson, Alicia Levy, Noah Skartvedt, and Michael Charles (Dkt. 18) (collectively, "Defendants").

**PRELIMINARY STATEMENT**

Novig operates a federally designated contract market ("DCM"). The Commodity Futures Trading Commission ("CFTC") granted that designation on June 16, 2026, after reviewing Novig's application and rulebook, evaluating its operational capabilities, and finding that Novig had demonstrated its ability to comply with the core principles of the Commodity Exchange Act ("CEA") and the CFTC's regulations. Compl., Dkt. 1 ¶¶ 6, 19, 73. Defendants nonetheless maintain that the event contracts listed, traded, and settled on Novig's exchange run afoul of Washington's gambling laws. *See* Dkt. 18 at 5. As Novig explained in its Complaint, Defendants' position is untenable because the CEA bars the application of state law to trading on a CFTC-designated exchange.

Defendants ask the Court to dismiss the Complaint with prejudice on the strength of a single interlocutory decision, *KalshiEX, LLC* v. *Assad*, 190 F.4th 1098 (9th Cir. 2026). *Assad* cannot bear that weight. The panel reviewed the dissolution of a preliminary injunction for abuse of discretion and held that Kalshi had not shown a *likelihood* that the CEA preempts Nevada law on the record before it. *Id.* at 1108. Its conclusion that sports event contracts are "likely not swaps" rested in significant part on a CFTC regulation, 17 C.F.R. § 40.11, that the panel said would control only "[u]ntil § 40.11(a) is amended in the manner described in" the CFTC's pending rulemaking. *Id.* at 1117, 1120. The concurring judge likewise found the statutory question "thorny" and declined to resolve it only because § 40.11 "remains in the books and controls the



**BRADLEY BERNSTEIN SANDS LLP**
2800 First Avenue, Suite 326
Seattle, WA 98121
Tel: (206) 337-6551

outcome of this appeal." *Id.* at 1124 (Lee, J., concurring). The CFTC has told the Ninth Circuit that it expects its replacement rule to become final by the end of November 2026.[1]

Since *Assad* was decided, however, the legal landscape has shifted in three important respects. Each development is an independently sufficient reason why this Court should not dismiss this action at the pleading stage. *First*, on October 19, 2026, the CFTC exercised its expressly delegated authority, *see* 15 U.S.C. § 8302(d)(1), to "further define" the term "swap" by publishing an Interim Final Rule that excludes off-exchange casino-style and sportsbook wagers from the swap definition. Further Definition of "Swap" to Exclude Casino-Style Gambling Products, 91 Fed. Reg. 65,969, 65,971–72, 65,979 (Oct. 19, 2026) ("IFR"). The CFTC also published a Notice of Proposed Rulemaking expressly recognizing that sports event contracts traded on federally designated exchanges fall within the "swap" definition and are therefore subject to the CFTC's exclusive jurisdiction. Further Definition of "Swap"—Inclusions, 91 Fed. Reg. 66,022, 66,025–29, 66,033 (proposed Oct. 19, 2026) ("NPRM"). By explaining how to draw the line between sportsbooks that are regulated by state gambling laws and prediction markets like Novig's that are regulated exclusively by the CFTC, these rulemakings supply the limiting principles and guidance that the *Assad* panel found missing. *Second*, although the Ninth Circuit denied Kalshi's petition for rehearing en banc on November 4, 2026, the questions the petition raised—including an internal inconsistency in the *Assad* panel's reasoning that cannot be squared with the CFTC's forthcoming rule—remain unresolved, and *Assad* remains subject to review by the Supreme Court. *See* Order, *KalshiEX, LLC* v. *Assad*, No. 25-7516 (9th Cir. Nov. 4, 2026), Dkt. 231.1 ("*Assad* Rehearing Order"). *Third*, three petitions for certiorari pending before the Supreme

[1] Kalshi's petition for rehearing and rehearing en banc is cited as Petition for Rehearing & Rehearing En Banc, *KalshiEX, LLC* v. *Assad*, No. 25-7516 (9th Cir. Sept. 9, 2026), Dkt. 206.1 ("*Assad* Pet."). The CFTC's timing representation appears in its Response to Motion for Summary Disposition at 2, *U.S. Commodity Futures Trading Comm'n* v. *Johnson*, No. 26-4281 (9th Cir. filed Sept. 24, 2026), Dkt. 29.1 ("*CFTC Resp.*").



**BRADLEY BERNSTEIN SANDS LLP**
2800 First Avenue, Suite 326
Seattle, WA 98121
Tel: (206) 337-6551

Court directly present the core preemption question, and their disposition could control here irrespective of *Assad*.[2]

Defendants' motion is also untimely: Defendants filed their motion nearly six weeks after their time to respond to the Complaint had expired, without any court-ordered extension, and after reaching agreements with other DCMs to stay further proceedings during the pendency of Ninth Circuit and Supreme Court appeals. Novig refrained from seeking a preliminary injunction in reliance on that understanding.

Finally, in view of the unsettled nature of the applicable law, if the Court decides to dismiss the Complaint, the dismissal should be without prejudice and with leave to amend. *Doe I* v. *Nestle USA, Inc.*, 766 F.3d 1013, 1028 (9th Cir. 2014) ("It is common practice to allow plaintiffs to amend their pleadings to accommodate changes in the law…")

## FACTUAL BACKGROUND

### A. Novig Built A Federally Regulated Exchange, Not A Sportsbook.

Novig, Inc. was formed in 2021 after its founders observed that established sportsbooks "routinely limited or banned customers who won too often," treating a successful bettor "the same way a casino treats a card counter." Compl., Dkt. 1 ¶¶ 63–64. The company set out to eliminate that practice, and its name reflects a business model that charges no "vig"—the commission a sportsbook builds into its odds. *Id.* ¶ 65.

On June 16, 2026, the CFTC designated Novig as a DCM after conducting a thorough review, as prescribed by the CEA. Compl., Dkt. 1 ¶¶ 6, 19, 73. As a DCM, Novig is subject to the CFTC's 23 "Core Principles," along with the broader CFTC regulatory framework. *Id.* ¶ 6.

Novig has built protections for participants that exceed what federal law requires. Only participants at least 21 years old may trade; participants may set binding limits on their trading and

---

[2] *See Flaherty* v. *KalshiEX, LLC*, No. 26-299 (U.S. filed Sept. 2, 2026); *N. Am. Derivatives Exch., Inc.* v. *Nevada*, No. 26-344 (U.S. filed Sept. 11, 2026).



**BRADLEY BERNSTEIN SANDS LLP**
2800 First Avenue, Suite 326
Seattle, WA 98121
Tel: (206) 337-6551

deposits and freeze their accounts; Novig enforces those elections through third-party identity screening; Novig participates in an industry-wide exclusion program; and it screens for traders with undue influence over, or material non-public information about, an outcome. *Id.* ¶ 7. On August 12, 2026, Novig formalized and expanded those commitments by self-certifying to the CFTC a new Chapter 14 of its Rulebook, titled "Responsible Trading Standards." Chapter 14[3] establishes binding standards governing participant education, marketing, platform design, participant controls, incentive programs, contract review, monitoring and intervention, and age and eligibility. Among other protections, it requires risk disclosures before trading, provides tools for participants to set limits and cooling-off periods (including trading freezes of one day to one year), restricts promotional practices that could encourage loss-chasing, requires monitoring for potentially concerning trading activity, and sets a minimum trading age of 21. As a DCM, Novig must also surveil its markets in real time, enforce its rules, and satisfy the CFTC's reporting, recordkeeping, and disciplinary requirements. Compl., Dkt. 1 ¶¶ 6, 74.

Novig's market structure differs in kind from that of a sportsbook. Contracts trade on an exchange, *id.* ¶ 20, and prices are generally set by participants, whose orders match by price and time priority through a non-discriminatory algorithm, *id.* ¶ 124. Novig's revenue does not depend on the outcome of any participant's position. *Id.* Novig does not limit participants for trading successfully, and it makes each participant's historical performance available on its platform. *Id.* Because contracts can be traded at any time before expiration, prices continuously reflect the market's assessment of the probability of the underlying event—information that advertisers,

---

[3] Ludlow Exchange, LLC, Self-Certification of Rule Amendments Establishing Responsible Trading Standards (Aug. 12, 2026), https://www.cftc.gov/filings/orgrules/rules08132616704.pdf. Chapter 14 postdates the Complaint. The Court may take judicial notice of this filing with Novig's federal regulator for the fact of its existence and contents. *See Khoja* v. *Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) ("[A] court may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment.") (citation omitted). Novig would plead this fact in an amended complaint. *See Part V.B, infra.*



**BRADLEY BERNSTEIN SANDS LLP**
2800 First Avenue, Suite 326
Seattle, WA 98121
Tel: (206) 337-6551

sponsors, broadcasters, hospitality businesses, and state-licensed sportsbooks can use to hedge financial exposure that turns on sporting outcomes. *Id.* ¶¶ 34–39.

### B. Congress Gave The CFTC Exclusive Jurisdiction Over Swaps Traded On DCMs.

In 1974, Congress created the CFTC and vested it with "exclusive jurisdiction" over transactions on federally designated exchanges. 7 U.S.C. § 2(a)(1)(A). At the same time, it struck the provision of the original Act that had preserved "any State law applicable" to futures trading—"[i]n order to assure that Federal preemption is complete." Compl., Dkt. 1 ¶¶ 11, 44–45 (quoting 120 Cong. Rec. 30,464 (1974) (statement of Sen. Curtis)). In the Dodd-Frank Act, Congress extended that exclusive jurisdiction to "transactions involving swaps . . . traded or executed on a contract market designated pursuant to section 7." 7 U.S.C. § 2(a)(1)(A); Compl., Dkt. 1 ¶ 48. It defined "swap" to include any contract that "provides for any purchase, sale, payment, or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence," 7 U.S.C. § 1a(47)(A)(ii); any "option of any kind" based on the value of commodities or "other financial or economic interests," *id.* § 1a(47)(A)(i); and any instrument that "is, or in the future becomes, commonly known to the trade as a swap," *id.* § 1a(47)(A)(iv). And Congress delegated to the CFTC and the SEC the authority to "further define" the term. 15 U.S.C. § 8302(d)(1); Compl., Dkt. 1 ¶ 95.

Congress also directly addressed event contracts that implicate "gaming." Under the CEA's special rule for event contracts (the "Special Rule"), the CFTC "may determine" that an event contract involving "activity that is unlawful under any Federal or State law, terrorism, assassination, war, gaming, or other similar activity" is "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i). The CFTC has long treated its implementing regulation, 17 C.F.R. § 40.11, as "a discretionary review framework rather than a self-executing *per se* prohibition." Prediction Markets; Public Interest Determinations, 91 Fed. Reg. 35,806, 35,815 (proposed June 12, 2026);



**BRADLEY BERNSTEIN SANDS LLP**
2800 First Avenue, Suite 326
Seattle, WA 98121
Tel: (206) 337-6551

Compl., Dkt. 1 ¶ 58. In June 2026, the CFTC proposed to replace § 40.11 with a detailed framework for public-interest determinations and preliminarily concluded that contracts settling on the outcomes of professional and collegiate sporting events are "unlikely to be found to be contrary to the public interest" where the exchange relies on objective settlement data and maintains appropriate surveillance. 91 Fed. Reg. at 35,835–36; Compl., Dkt. 1 ¶ 13. The CFTC has represented to the Ninth Circuit that it expects that rule to become final within two months of its September 24, 2026 filing—that is, by the end of November 2026. *CFTC Resp.* at 2.

### C. The CFTC's October 2026 Interim Final Rule And Notice Of Proposed Rulemaking.

On October 9, 2026, the CFTC issued two further actions under its delegated authority to "further define" the term "swap," both published in the Federal Register on October 19, 2026. The CFTC did so in direct response to judicial decisions—including the Sixth Circuit's decision in *KalshiEX LLC* v. *Schuler*, 2026 WL 2884087 (6th Cir. Sept. 25, 2026)—that in the agency's view had "deviate[d] from the plain text of the 'swap' definition" and "impose[d] atextual limitations on the concept of an 'event.'" IFR, 91 Fed. Reg. at 65,971.

The IFR codifies the CFTC's position that casino-style gambling products, including wagers placed with sportsbooks, are excluded from the "swap" definition. It provides that a "swap" "does not include" contracts that are "regulated as gaming or gambling under applicable State or Tribal law" and "not traded on a board of trade" or other "organized exchange." *Id.* at 65,979. The CFTC adopted the rule to correct "the erroneous premise that if event contracts are swaps, then casino-style gambling products must also be swaps." *Id.* at 65,971. It explained the structural differences between exchange-traded event contracts and sportsbook wagers, *id.* at 65,973–75, and observed that sportsbooks have "a longstanding history of being subject to a distinct regulatory framework" that "structurally does not lend itself to the requirements of the CEA, including its exchange-trading requirement," *id.* at 65,974.



**BRADLEY BERNSTEIN SANDS LLP**
2800 First Avenue, Suite 326
Seattle, WA 98121
Tel: (206) 337-6551

The companion NPRM proposes to define "swap" to include "[e]vent contracts, including those based on sports-, politics-, cultural-, and weather-related events." NPRM, 91 Fed. Reg. at 66,033. The CFTC proposed the rule because of "widespread confusion," to "expressly clarify that event contracts, including those based on sports . . . are swaps," and to provide an "independent legal basis" for that conclusion, "facilitat[ing] uniform nationwide treatment of event contracts under the exclusive jurisdiction of the Commission." *Id.* at 66,025, 66,031. The CFTC identified three independent statutory grounds: sports event contracts are "commonly known to the trade as a swap," 7 U.S.C. § 1a(47)(A)(iv); they depend on events "associated with a potential financial, economic, or commercial consequence," *id.* § 1a(47)(A)(ii)—such as ticketing revenue, franchise valuation, viewership, player bonuses, and outcome-linked business promotions; and they are binary options under § 1a(47)(A)(i). NPRM, 91 Fed. Reg. at 66,025–29. The CFTC further explained that the Special Rule, "[f]ar from exempting sports-related contracts from the CFTC's jurisdiction, . . . confirms that such instruments can be 'swaps' . . . within the CFTC's jurisdiction." *Id.* at 66,028.

**D. Washington Has Declared Event Contracts Illegal And Sued A DCM.**

On December 9, 2025, the Washington State Gambling Commission declared that "prediction markets are an unauthorized activity in Washington State" and that "[o]ffering events-based contracts or participating in these markets is not authorized in Washington State." Compl., Dkt. 1 ¶ 80. On March 27, 2026, Defendant Brown sued KalshiEX LLC, a CFTC-designated DCM, in King County Superior Court under the Gambling Act, the Consumer Protection Act, and the Recovery of Money Lost at Gambling Act, seeking injunctive relief, restitution, disgorgement, civil penalties, and an accounting. *Id.* ¶¶ 81, 83. The Superior Court preliminarily enjoined Kalshi's Washington operations on July 20, 2026. *Id.* ¶ 8. Defendants' theory is that "any event contract—regardless of subject matter—constitutes 'gambling,'" irrespective of the CFTC's designation of the exchange or its treatment of the contract. *Id.* ¶ 84. Defendants have declared that no license is available for offering event contracts in the State. *Id.* ¶¶ 85, 117.



**BRADLEY BERNSTEIN SANDS LLP**
2800 First Avenue, Suite 326
Seattle, WA 98121
Tel: (206) 337-6551

**E. *Assad* And The Denial Of Rehearing En Banc.**

In *Assad*, the Ninth Circuit reviewed a district court order dissolving a preliminary injunction that had barred Nevada from enforcing its gaming laws against Kalshi. *Assad*, 190 F.4th at 1108. The panel first held that, "based on its plain wording, § 2 preempts state regulation of swaps that are 'traded or executed' on a DCM," and declined to apply any presumption against preemption. *Id.* at 1110. Addressing only the definitional clause on which Kalshi relied, § 1a(47)(A)(ii), the panel concluded that Kalshi's sports event contracts were "likely not swaps." *Id.* at 1111, 1120. In rejecting Kalshi's Special Rule argument, the panel relied on its reading of 17 C.F.R. § 40.11(a) as a categorical prohibition, while acknowledging that the CFTC disagreed, and stated that "[u]ntil § 40.11(a) is amended in the manner described in the [June 2026 proposed rule], it bars Kalshi's gaming-related contracts from being listed on a DCM. As of now, the existing regulation controls." *Id.* at 1117–18. Judge Lee concurred, explaining that the Special Rule "gives me pause" because the statute "does not seem to categorically bar all gaming contracts," but that § 40.11 "remains in the books and controls the outcome of this appeal." *Id.* at 1124 (Lee, J., concurring). The panel rejected conflict preemption "[o]n this record," *id.* at 1121, and rejected field preemption because it disagreed that the contracts were swaps, *id.* at 1121–22.

On September 9, 2026, Kalshi petitioned for rehearing and rehearing en banc. *Assad* Pet. at 1. On November 4, 2026, the Ninth Circuit denied the petition. *Assad* Rehearing Order. The order did not address the merits of the petition's arguments. *See id.*

**F. Defendants Filed A Motion To Dismiss Two Months After Novig's Complaint.**

Novig filed this action on August 6, 2026. Compl., Dkt. 1 ¶¶ 16–17. Defendants were served by August 18, 2026, making their response to the Complaint due 21 days later. Fed. R. Civ. P. 12(a)(1)(A)(i). While Novig offered to consent to an extension and Defendants indicated that they wished to accept an extension, Defendants never responded to Novig's invitation to prepare



**BRADLEY BERNSTEIN SANDS LLP**
2800 First Avenue, Suite 326
Seattle, WA 98121
Tel: (206) 337-6551

and file a stipulation to effectuate any such agreement. Accordingly, no stipulation or motion to extend that deadline was presented to the Court. *See* Walker Decl. Ex. A.

In the meantime, the State agreed not to pursue enforcement action against Crypto.com pending an order from the district court following resolution of the Ninth Circuit appeals. *See N. Am. Derivatives Exch., Inc.* v. *Brown*, No. 2:26-cv-02579, Dkt. 20 (W.D. Wash. Aug. 27, 2026). Washington had previously reached a similar agreement with Robinhood. *See Robinhood Derivatives, LLC* v. *Griffin*, No. 3:26-cv-05311, Dkt. 17 (W.D. Wash. May 21, 2026). Given discussions between counsel for Novig and for the State after Novig filed its complaint, *see* Walker Decl. Ex. A, combined with the non-enforcement agreements mentioned above, Novig had good reason to believe that enforcement was not imminent.

On October 19, 2026—with the *Assad* en banc petition still pending—Defendants abruptly filed their motion. Dkt. 18. Defendants' motion does not explain why they waited two months after being served to file it. Nor does it explain why the State reached non-enforcement agreements with Crypto.com and Robinhood, but refused to do so with Novig, given that the Ninth Circuit appeals process was ongoing and there are three petitions for certiorari before the Supreme Court.

## LEGAL STANDARD

To survive a motion under Rule 12(b)(6), a complaint need only "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)). The Court accepts well-pleaded factual allegations as true and draws all reasonable inferences in the plaintiff's favor. Dismissal is appropriate "only where there is no cognizable legal theory or an absence of sufficient facts alleged to support" one. *Davidson* v. *Kimberly-Clark Corp.*, 889 F.3d 956, 965 (9th Cir. 2018) (quoting *Navarro* v. *Block*, 250 F.3d 729, 732 (9th Cir. 2001)). Dismissal without leave to amend is proper only where "it is clear . . . that the complaint could not be saved by any



**BRADLEY BERNSTEIN SANDS LLP**
2800 First Avenue, Suite 326
Seattle, WA 98121
Tel: (206) 337-6551

amendment." *Vasquez* v. *Los Angeles Cnty.*, 487 F.3d 1246, 1258 (9th Cir. 2007); Fed. R. Civ. P. 15(a)(2).

## ARGUMENT

### I. THE MOTION IS UNTIMELY, AND DEFENDANTS' REVERSAL UNDERCUTS ANY CLAIM OF URGENCY.

A defendant must serve a responsive pleading within 21 days after being served with the summons and complaint, and a motion under Rule 12(b) "must be made before pleading." Fed. R. Civ. P. 12(a)(1)(A)(i), 12(b). Defendants were served by August 18, 2026, so their response was due by September 8. *See Factual Background, Part F, supra;* Fed. R. Civ. P. 6(a)(1). Despite Novig's stated willingness to stipulate to an extension of the response deadline, Defendants never sought a Court order extending the deadline. Only the Court may do so, Fed. R. Civ. P. 6(b)(1), and in this District a stipulation binds the Court "only if adopted by the court through an order," W.D. Wash. LCR 10(g). Furthermore, the Local Rules require that "[a] motion for relief from a deadline should, whenever possible, be filed sufficiently in advance of the deadline" and that "[p]arties should not assume that the motion will be granted and must comply with the existing deadline unless the court orders otherwise." W.D. Wash. LCR 7(j). Defendants filed their motion on October 19—two months after service of the complaint—without seeking leave or attempting the showing of excusable neglect that a post-deadline extension requires. Fed. R. Civ. P. 6(b)(1)(B). The motion does not acknowledge the delay. Although Rule 12(h)(2) preserves the defense of failure to state a claim for later stages of the case, it does not entitle Defendants to an out-of-time Rule 12(b)(6) ruling.

Under Rule 6(b)(1)(B), Defendants must show that their failure to timely move for dismissal was due to "excusable neglect." In assessing whether neglect was excusable, courts weigh "(1) the danger of prejudice to the opposing party; (2) the length of the delay and its potential impact on the proceedings; (3) the reason for the delay; and (4) whether the movant acted



**BRADLEY BERNSTEIN SANDS LLP**
2800 First Avenue, Suite 326
Seattle, WA 98121
Tel: (206) 337-6551

in good faith." *Ahanchian* v. *Xenon Pictures, Inc.*, 624 F.3d 1253, 1261 (9th Cir. 2010). Defendants have made no request for relief or showing under that standard.

Defendants' delay was not inadvertent; it reflected an arrangement that Defendants themselves proposed to Novig's counsel to stay further proceedings pending the resolution of the Ninth Circuit's en banc process—a proposal that was consistent with the State's approach in other cases involving similarly situated parties. *See N. Am. Derivatives Exch.,* No. 2:26-cv-02579, Dkt. 20; *Robinhood*, No. 3:26-cv-05311, Dkt. 17. Novig relied on that understanding. Although Novig had signaled that it would seek expedited preliminary relief, Compl., Dkt. 1 ¶ 17, it refrained from filing a preliminary-injunction motion so that neither the parties nor the Court would expend resources on questions that will be resolved through the ongoing appellate process.

Defendants have offered no legal or factual justification for why they suddenly seek to litigate this issue against Novig while continuing to honor non-enforcement agreements with other similarly situated parties such as Crypto.com and Robinhood. Those agreements only underscore that litigating this case now is a poor use of judicial resources, given that the preemption question remains subject to Supreme Court review and Defendants have already agreed to stay enforcement against other similarly situated parties.

Accordingly, Novig requests that the Court deny Defendants' motion to dismiss as untimely under Rules 6(b) and 12(b).

## II. *ASSAD* DOES NOT REQUIRE DISMISSAL OF NOVIG'S COMPLAINT.

Defendants' motion rests on the premise that *Assad* "conclusively resolved" the preemption question in this Circuit and that Novig's claim therefore fails as a matter of law. Dkt. 18 at 1. That premise misreads what *Assad* decided and ignores what has happened since.

### A. *Assad* Decided Only That Kalshi Had Not Shown A Likelihood Of Success On A Preliminary-Injunction Record.

*Assad* arose on interlocutory review of an order dissolving a preliminary injunction, and the panel reviewed that order only for abuse of discretion. *Assad*, 190 F.4th at 1108. Its holdings are

**BRADLEY BERNSTEIN SANDS LLP**
2800 First Avenue, Suite 326
Seattle, WA 98121
Tel: (206) 337-6551

accordingly framed as a probabilistic conclusion that Kalshi "has not shown a likelihood that the CEA preempts state gaming regulations." *Id.* At the same time, the panel recognized that the statutory terms "can yield competing, legitimate interpretations," *id.* at 1120, and that Kalshi's reading had both a "cursory plain-language appeal" and "a colorable textual basis," *id.* at 1111, 1118. For these reasons, the *Assad* ruling that a different prediction market had not carried its burden of showing a likelihood of success cannot control the distinct question here—the legal sufficiency of Novig's Complaint. *See Univ. of Tex.* v. *Camenisch*, 451 U.S. 390, 395 (1981) ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held" and "findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits").

That distinction matters here because much of *Assad's* reasoning turned on facts specific to Kalshi. The panel emphasized that Kalshi "advertises itself as 'the first app for legal sports betting in all 50 states,'" and took note of Kalshi's marketing campaign, which touted its own contracts to the public as "legal sports betting." *Assad*, 190 F.4th at 1104, 1113. The panel also took stock of representations that Kalshi had made in earlier litigation before the D.C. Circuit, where Kalshi argued that an event contract "involves 'gaming' if it is contingent on a game or a game-related event—like the Kentucky Derby, Super Bowl, or Masters golf tournament," and that "[t]he classic example is a contract on the outcome of a sporting event." *Id.* at 1118 (quoting Brief for Appellee KalshiEX, LLC, *KalshiEX LLC* v. *Commodity Futures Trading Comm'n*, 119 F.4th 58 (D.C. Cir. 2024), 2024 WL 4802698, at *17, *41). The panel attributed Kalshi's change in position to "its new business strategy." *Id.* at 1118. None of those facts appears in Novig's Complaint. Novig alleges that it was founded to eliminate the sportsbook practice of penalizing winning customers; that it charges no vig; that prices on its exchange are set by participants through a non-discriminatory matching algorithm; and that its revenue does not depend on any participant's outcome. Compl., Dkt. 1 ¶¶ 64–65, 122–24. It also alleges that it first sought and held a state license, then obtained federal designation through the full process Congress prescribed. *Id.* ¶¶ 66–76. Those allegations



**BRADLEY BERNSTEIN SANDS LLP**
2800 First Avenue, Suite 326
Seattle, WA 98121
Tel: (206) 337-6551

must be accepted as true at this stage, and they distinguish Novig's exchange from the record the *Assad* panel described.

Defendants respond that "there is no distinction" between Novig's contracts and Kalshi's, Dkt. 18 at 6, and that, from a customer's perspective, an event contract and a sports bet look alike, *id.* at 7–8. But whether Novig's exchange in fact operates as the Complaint alleges, and whether those structural features bear on the statutory analysis, are not questions that can be resolved against Novig on a motion to dismiss.

**B. *Assad's* Swap Holding Rested On A Regulation The CFTC Is About To Replace.**

The panel's answer to the Special Rule—the strongest textual evidence that Congress placed event contracts involving "gaming" within the CFTC's jurisdiction—was expressly tied to the current text of § 40.11. The panel reasoned that § 40.11(a) "prohibits Kalshi from listing its sports event contracts on a DCM," rejected the CFTC's contrary reading of its own rule, and concluded that § 40.11(a), until it is amended "in the manner described in the [June 2026 proposed rule]," "bars Kalshi's gaming-related contracts from being listed on a DCM." *Assad*, 190 F.4th at 1117. Judge Lee was more explicit still. He recognized that the Special Rule "appears to give the CFTC discretion whether to ban altogether gaming contracts," such that "the statute does not seem to categorically bar all gaming contracts," and he acknowledged that "perhaps some unique sports events can be part of a swap trade if they meet the statutory requirements." *Id.* at 1124 (Lee, J., concurring). He nonetheless found it unnecessary to resolve "this thorny statutory interpretation question right now" because, in his view, § 40.11 bars gaming contracts and it "remains in the books and controls the outcome of this appeal." *Id.*

This reasoning is unlikely to apply for much longer. The CFTC proposed in June 2026 to replace § 40.11 with a framework under which many sports event contracts are expected to be found consistent with the public interest, 91 Fed. Reg. at 35,836, and it has told the Ninth Circuit that it expects the replacement to become final by the end of November 2026, *CFTC Resp.* at 2. The promulgation of that rule will undercut the foundation of the *Assad* panel decision, and the



**BRADLEY BERNSTEIN SANDS LLP**
2800 First Avenue, Suite 326
Seattle, WA 98121
Tel: (206) 337-6551

question Judge Lee identified—whether the Special Rule presupposes that event contracts involving gaming can be swaps within the CFTC's jurisdiction—will have to be confronted directly. Kalshi's petition for rehearing en banc made precisely this point. It explained that the panel's decision "relies on reasoning that will be obsolete when the CFTC promulgates the final rule replacing Rule 40.11," *Assad* Pet. at 5, and that "[o]nce that new rule is finalized, the panel's decision will no longer govern because its holding depends on the (erroneous) proposition that Rule 40.11 currently bars all sports-event contracts," *id.* at 11. The petition further explained that "[i]t cannot be that Congress both excluded sports-event contracts from the 'swap' definition to ensure they are never traded on DCMs and granted the CFTC authority to decide whether those contracts may be traded under the Special Rule." *Id.* at 3. The Ninth Circuit's denial of rehearing did not address those arguments, which remain unanswered. *See Assad* Rehearing Order (denying panel rehearing and rehearing en banc without opinion). For that reason, the most efficient course is to deny the motion to dismiss and await further guidance once the new rule is promulgated. A claim that turns on a legal question the concurrence expressly reserved, under a regulatory framework that is about to change, is not one that "fails as a matter of law."

**C. The CFTC's October 2026 Rulemakings Supply The Limiting Principle *Assad* Found Lacking.**

The panel's core concern was that a broad reading of "swap" lacks a limiting principle. More specifically, the panel asserted that treating sports event contracts as swaps would mean that "every person placing a sports bet at Caesar's Sportsbook . . . is violating the CEA." *Assad*, 190 F.4th at 1115; *see* Dkt. 18 at 10. The CFTC has since issued an interim final rule and a notice of proposed rulemaking that address that concern.

The IFR provides that a swap "does not include" contracts that are regulated as gaming under state or tribal law and are not traded on an organized exchange. 91 Fed. Reg. at 65,979. Under that rule, a wager at a state-licensed sportsbook is not a swap, no bettor commits a federal offense by placing one, and the States' authority over sportsbooks and casinos remains intact. The



**BRADLEY BERNSTEIN SANDS LLP**
2800 First Avenue, Suite 326
Seattle, WA 98121
Tel: (206) 337-6551

CFTC adopted the IFR to correct "the erroneous premise that if event contracts are swaps, then casino-style gambling products must also be swaps." *Id.* at 65,971. And the NPRM, for its part, proposes to confirm that event contracts "including those based on sports" are swaps, grounded in three independent provisions of the statutory definition. 91 Fed. Reg. at 66,025–29.

These new agency actions also identify additional reasons why sports event contracts are swaps. The *Assad* panel's swap analysis addressed only one clause of the definition, § 1a(47)(A)(ii). *Assad*, 190 F.4th at 1111. The NPRM, by contrast, identifies § 1a(47)(A)(i) (options) and § 1a(47)(A)(iv) (instruments "commonly known to the trade as a swap") as independent grounds for treating sports event contracts as swaps. NPRM, 91 Fed. Reg. at 66,025–27. Novig's Complaint invokes the breadth of the definition, including clause (iv), Compl., Dkt. 1 ¶¶ 50, 95, and any amended complaint would plead clause (i) as well. The *Assad* decision never grapples with these alternate, independent bases for finding that sports event contracts like those offered by Novig are swaps, and because *Assad* did not decide those questions, it cannot foreclose them.

These actions also explain why the major-questions doctrine, on which the *Assad* panel relied as part of its analysis, is inapplicable here. *Assad*, 190 F.4th at 1118–19; Dkt. 18 at 11–12. The question is not whether Congress "delegated its power to regulate gambling" to the CFTC, *Assad*, 190 F.4th at 1119; it is instead whether Congress placed exchange-traded derivatives—a category it has entrusted to a single federal regulator for half a century—within that regulator's exclusive jurisdiction. The IFR confirms that the CFTC claims no authority over sportsbooks, casinos, or other off-exchange gambling. Washington "remains free to license and police" all of it. Compl., Dkt. 1 ¶ 115. That is a far narrower assertion of federal authority than the *Assad* panel had anticipated.

Defendants dismiss the CFTC's position as an "about-face" entitled to no weight under *Loper Bright Enters.* v. *Raimondo*, 603 U.S. 369 (2024). Dkt. 18 at 9. But *Loper Bright* addressed judicial deference to agency interpretations of ambiguous statutory terms. Indeed, it expressly recognized that when a statute "expressly delegate[s]" to an agency the authority to give meaning



**BRADLEY BERNSTEIN SANDS LLP**
2800 First Avenue, Suite 326
Seattle, WA 98121
Tel: (206) 337-6551

to a particular statutory term, the court's role is to respect that delegation and ensure the agency acts within its bounds. *Loper Bright*, 603 U.S. at 394–95 (quoting *Batterton* v. *Francis*, 432 U.S. 416, 425 (1977)). The following Term, the Supreme Court reaffirmed that "when an agency exercises discretion granted by a statute, judicial review is typically conducted under the Administrative Procedure Act's deferential arbitrary-and-capricious standard," in which a court "asks not whether it agrees with the agency decision, but rather only whether the agency action was reasonable and reasonably explained." *Seven Cnty. Infrastructure Coal.* v. *Eagle Cnty.*, 605 U.S. 168, 179–80 (2025). Congress delegated exactly that kind of authority here: it directed the CFTC to "further define" the term "swap." 15 U.S.C. § 8302(d)(1). The October 2026 rulemakings are exercises of that delegated authority, not litigating positions. And the *Assad* panel had no occasion to consider them, because they did not exist when it ruled. Nor did the Sixth Circuit in *Schuler*, which the IFR specifically identified as one of the decisions that had imposed "atextual limitations" on the statute. IFR, 91 Fed. Reg. at 65,971.[4]

**D. *Assad* Confirms That Section 2(a)(1)(A) Is An Express Preemption Provision.**

Although *Assad* erred in concluding that sports event contracts are not swaps, the decision nonetheless started on the right foot on the preemption question by holding that Section 2 of the CEA "preempts state regulation of swaps that are 'traded or executed' on a DCM." *Assad*, 190 F.4th at 1110. The panel also correctly concluded that Section 2 was intended to serve as a preemptive provision and that the presumption against preemption therefore does not apply in this context. *Id.* The Third Circuit agrees. *KalshiEX LLC* v. *Flaherty*, 172 F.4th 220, 229–31 (3d Cir. 2026).

---

[4] Defendants also rely on a 2024 proposed rule in which the CFTC described itself as not a gaming regulator. Dkt. 18 at 8–9 (citing 89 Fed. Reg. 48,968). That proposal is consistent with the IFR, which likewise disclaims authority over off-exchange gambling. Regardless, what matters is the agency's current, formal exercise of its delegated authority to define the statutory term.



**BRADLEY BERNSTEIN SANDS LLP**
2800 First Avenue, Suite 326
Seattle, WA 98121
Tel: (206) 337-6551

To be sure, the Sixth Circuit came out differently on that question in *Schuler*, but that decision is flawed and should not be followed here for the reasons spelled out in *Assad's* express-preemption analysis. *Assad*, 190 F.4th at 1110. And even *Schuler* recognized that the CEA's exclusive-jurisdiction provision "displaces direct enforcement and regulatory authority pertaining to the licensing and operation of" designated contract markets, *Schuler*, 2026 WL 2884087, at *21—precisely the authority Defendants claim when they declare that no DCM may offer event contracts to Washington residents. Compl., Dkt. 1 ¶¶ 80, 84–85. In any event, as Defendants concede, *Schuler* is "not the law in this Circuit," Dkt. 18 at 13, and it is itself the subject of a pending petition for rehearing en banc. Pet. for Reh'g En Banc, *KalshiEX LLC* v. *Schuler*, No. 26-3196 (6th Cir. Oct. 9, 2026), Dkt. 92.

## III. THE UNSETTLED STATE OF THE LAW COUNSELS AGAINST DISMISSAL WITH PREJUDICE.

When they filed their motion, Defendants acknowledged that Kalshi's petition for rehearing en banc was pending. Dkt. 18 at 6. The Ninth Circuit has since denied it. *Assad* Rehearing Order (denying panel rehearing and rehearing en banc without opinion). But the order does not engage with, much less resolve, the defects the petition identified, *see id.*, and those defects bear directly on this case and on the likelihood of further review. They are no basis for a with-prejudice dismissal.

*First*, the petition identified a direct conflict with the Third Circuit. The *Flaherty* court recognized that sports event contracts "fit comfortably within the statutory definition" of swap, and affirmed a preliminary injunction barring New Jersey from enforcing its gaming laws against them. *Assad* Pet. at 12–13 (quoting *Flaherty*, 172 F.4th at 227–28). The *Assad* panel reached the opposite conclusion on swap status, field preemption, conflict preemption, the effect of § 40.11, and irreparable harm. *Id.* at 13–14. With rehearing denied, that circuit split is now entrenched—and an entrenched split on a question of this magnitude is precisely the kind of conflict that warrants Supreme Court review.



**BRADLEY BERNSTEIN SANDS LLP**
2800 First Avenue, Suite 326
Seattle, WA 98121
Tel: (206) 337-6551

*Second*, the petition explained that the panel's reasoning is internally inconsistent. The panel construed the swap definition to exclude sports event contracts because Congress could not have intended them to trade on DCMs, yet also recognized that the Special Rule authorizes the CFTC to bar such contracts when—but only when—it finds them contrary to the public interest. *Assad* Pet. at 10–11. "If the CEA prevents trading of all sports-event contracts, then it cannot possibly let the CFTC decide when those contracts may be traded." *Id.* at 11. The panel bridged that gap only by reading § 40.11 as imposing a categorical ban on sports event contracts, but even assuming that is the best reading of § 40.11 (it is not), the CFTC is close to finalizing a replacement rule that will likely permit some sports event contracts. *Id.* at 11–12. The petition explained that the decision's "holding depends on the (erroneous) proposition that Rule 40.11 currently bars all sports-event contracts," and that States "will inevitably seek to rely on other parts of the decision" in ways the panel did not resolve. *Id.* The denial of rehearing leaves that inconsistency in place. This case illustrates the problem: Defendants seek a with-prejudice dismissal based on a decision whose operative premise will likely lapse before this motion is decided.

*Third*, the petition identified developments that undercut the panel's conflict-preemption analysis. The panel found no conflict because Kalshi had not shown that complying with state law would jeopardize its DCM status. *Assad*, 190 F.4th at 1121. While the appeal was pending, the CFTC ordered Kalshi "to fulfill the trades in question in accordance with its normal practices" when Kalshi sought to unwind trades to comply with a Michigan state-court order, and it directed Kalshi "to continue to operate its exchange in accordance with its normal practices" even if New York obtained relief against it. *Assad* Pet. at 13 n.1 (citing CFTC orders of July 14, 2026, and Aug. 11, 2026). Those orders demonstrate that the federal regulator regards compliance with state-law commands to cease or unwind DCM trading as inconsistent with federal requirements—exactly the conflict the Complaint alleges. Compl., Dkt. 1 ¶¶ 85–86, 116–17.

The prospect of further review is not academic. Defendants themselves preserved arguments for the scenario in which "*Assad* is vacated." Dkt. 18 at 13 n.4. The denial of rehearing



**BRADLEY BERNSTEIN SANDS LLP**
2800 First Avenue, Suite 326
Seattle, WA 98121
Tel: (206) 337-6551

does not foreclose that scenario: Kalshi may petition the Supreme Court for a writ of certiorari within 90 days of the November 4, 2026, order. *See* Sup. Ct. R. 13.3; *Assad* Rehearing Order. And petitions for certiorari presenting the same preemption question are already before the Supreme Court. *Flaherty*, No. 26-299; *Robinhood Derivatives, LLC* v. *Dreitzer*, No. 26-338 (U.S. filed Sept. 10, 2026); *N. Am. Derivatives Exch.,* No. 26-344. A coalition of States led by Ohio has urged the Court to grant review, describing the question as "an issue of immense importance" on which "[f]ederal and state courts are hopelessly confused and divided." Br. of Amici Curiae Ohio et al. in Supp. of Pet'rs at 1, *Flaherty*, No. 26-299 (U.S. Oct. 7, 2026). Defendants' own motion confirms the division: it acknowledges contrary decisions from the Third Circuit and the Northern District of Illinois, Dkt. 18 at 12, 14, and courts within this Circuit have reached conflicting results, *compare KalshiEX LLC* v. *Johnson*, 832 F. Supp. 3d 954 (D. Ariz. 2026) (granting preliminary injunction), *appeal docketed*, No. 26-2978 (9th Cir.), *with N. Am. Derivatives Exch., Inc.* v. *Nevada ex rel. Nev. Gaming Control Bd.*, 815 F. Supp. 3d 1169 (D. Nev. 2025).[5]

Dismissing Novig's claim with prejudice on the basis of a decision that remains subject to Supreme Court review, that rests on a regulation about to be replaced, and that addresses a question the Supreme Court may soon take up would risk an unnecessary appeal.

## IV. THE COMPLAINT STATES A PLAUSIBLE PREEMPTION CLAIM.

### A. The Complaint Plausibly Alleges Express Preemption.

Express preemption requires two elements here: that Novig's contracts are "swaps," and that they are "traded or executed on a contract market designated pursuant to section 7." 7 U.S.C. § 2(a)(1)(A). The second element is undisputed—Novig is a CFTC-designated DCM, and every

[5] Defendants' assertion that *Johnson*, 832 F. Supp. 3d 954, and *KalshiEX LLC* v. *Orgel*, 2026 WL 474869 (M.D. Tenn. Feb. 19, 2026), are "no longer good law," Dkt. 18 at 12 n.3, does not eliminate their persuasive value. Novig recognizes that an operative circuit holding controls within that circuit; the pending rehearing petition in *Schuler* and the pending certiorari petitions, however, underscore the unsettled nature of the broader preemption question.



**BRADLEY BERNSTEIN SANDS LLP**
2800 First Avenue, Suite 326
Seattle, WA 98121
Tel: (206) 337-6551

contract at issue is listed, traded, and settled on its exchange. Compl., Dkt. 1 ¶¶ 19–20, 74. *Assad* holds that § 2 expressly preempts state regulation of such swaps. *Assad*, 190 F.4th at 1110.

The Complaint plausibly alleges the first element. Each of Novig's contracts provides for a payment that depends on the occurrence, nonoccurrence, or extent of the occurrence of a defined event, and each such event is associated with potential financial, economic, or commercial consequences. Compl., Dkt. 1 ¶¶ 94, 96. The Complaint does not rest on abstract possibility; it identifies the parties whose finances turn on sporting outcomes and explains how they can use exchange-traded contracts to hedge that exposure—a sponsor whose marketing spend is tied to a postseason run, a hotel whose occupancy depends on a home playoff game, a broadcaster whose advertising revenue turns on a star player's participation, and a state-licensed sportsbook whose book concentrates exposure to a particular outcome. *Id.* ¶¶ 37–38. Those allegations must be accepted as true. The CFTC has reached the same conclusion, identifying ticketing revenue, franchise valuation, viewership, player bonuses, and outcome-linked business promotions as consequences associated with sporting events. NPRM, 91 Fed. Reg. at 66,029. So has the Third Circuit. *Flaherty*, 172 F.4th at 227–28. And so have district courts in Minnesota and Illinois. *United States* v. *Minnesota*, 2026 WL 2150211, at *1, *10–12 (D. Minn. July 27, 2026); *Coinbase Fin. Mkts., Inc.* v. *Raoul*, 2026 WL 2969682, at *7, *18 (N.D. Ill. Oct. 2, 2026) (definition "reads about as broadly as it could").

The statutory structure confirms the point. Congress carved precisely two underliers out of the CEA's reach—onions and motion-picture box-office receipts—and sporting events are not among them. 7 U.S.C. § 1a(9); Compl., Dkt. 1 ¶ 97. Congress wrote the swap definition to capture any instrument that "in the future becomes" commonly known to the trade as a swap. 7 U.S.C. § 1a(47)(A)(iv). And in the Unlawful Internet Gambling Enforcement Act, Congress excluded "any transaction conducted on or subject to the rules of" a DCM from the definition of "bet or wager." 31 U.S.C. § 5362(1)(E)(ii); *see Assad* Pet. at 20. Washington's own Gambling Act



**BRADLEY BERNSTEIN SANDS LLP**
2800 First Avenue, Suite 326
Seattle, WA 98121
Tel: (206) 337-6551

likewise excludes "bona fide business transactions" from its definition of gambling. Wash. Rev. Code § 9.46.0237; *see Assad* Pet. at 20 n.5.

**B. The Special Rule Confirms That Event Contracts Involving Gaming Fall Within The CFTC's Jurisdiction.**

The Special Rule authorizes the CFTC to determine that an event contract involving "gaming" is contrary to the public interest and, if it so determines, to bar its listing. 7 U.S.C. § 7a-2(c)(5)(C)(i)–(ii). That provision presupposes that such contracts are within the CFTC's jurisdiction; if event contracts escaped federal authority the moment they touched gaming, the Special Rule would have nothing to operate on. Compl., Dkt. 1 ¶¶ 59, 119–20; *see Pulsifer* v. *United States*, 601 U.S. 124, 143 (2024). Congress thus assigned the gaming question to the CFTC, on a contract-by-contract basis, rather than to fifty state gaming regulators. Compl., Dkt. 1 ¶ 59. The NPRM adopts that reading, 91 Fed. Reg. at 66,028, and Judge Lee recognized its force, *Assad*, 190 F.4th at 1124 (Lee, J., concurring). Defendants' contrary argument—that the Special Rule "did not give the CFTC any more preemptive authority over gaming than it gave the CFTC authority over terrorism or assassination," Dkt. 18 at 11 (quoting *Assad*, 190 F.4th at 1117)—proves Novig's point. Congress did give the CFTC authority to review and bar contracts in each enumerated category. That is what the Special Rule says.

**C. The Complaint Plausibly Alleges Field And Conflict Preemption.**

*Field preemption*. The CEA "is a comprehensive regulatory scheme" that preempts the field of "regulating swaps traded on a DCM." *Assad*, 190 F.4th at 1121–22. Because the Complaint plausibly alleges that Novig's contracts are swaps, *see* Part IV.A, *supra*, it plausibly alleges field preemption as well. The relevant field is not gambling generally—Novig does not contend that the CEA displaces Washington's regulation of sportsbooks, casinos, or any other form of gambling conducted off a DCM, Compl., Dkt. 1 ¶ 115—but the regulation of trading on federally designated contract markets, *id.* ¶¶ 109–10. Congress has occupied that field by prescribing who may operate



**BRADLEY BERNSTEIN SANDS LLP**
2800 First Avenue, Suite 326
Seattle, WA 98121
Tel: (206) 337-6551

a DCM, what contracts may be listed and how, how trading is conducted and surveilled, and what consequences follow from noncompliance. *Id.* ¶ 110; *see Flaherty*, 172 F.4th at 229.

*Conflict preemption.* As alleged in the Complaint, Washington does not license event contracts; it prohibits them outright, and Defendants have declared that no license is available. Compl., Dkt. 1 ¶¶ 85, 117. Confining an exchange's participants within state lines deprives it of the counterparties that make the market function, degrades price discovery, and frustrates the national market Congress created. *Id.* ¶¶ 68, 85; 7 U.S.C. § 5(a). State enforcement of this kind "is exactly the patchwork that Congress replaced wholecloth by creating the CFTC." *Flaherty*, 172 F.4th at 230. DCMs must provide "impartial access" to their markets, 17 C.F.R. § 38.151(b), and the CFTC has acted to require DCMs to continue operating and fulfilling trades notwithstanding state-court commands, *Assad* Pet. at 13 n.1.[6] Whether those conflicts exist on this record is a factual question that cannot be resolved against Novig on the pleadings.

## V. ALTERNATIVELY, ANY DISMISSAL SHOULD BE WITHOUT PREJUDICE AND WITH LEAVE TO REPLEAD.

### A. Any Dismissal Should Be Without Prejudice.

Even if the Court were to conclude that *Assad*, as it now stands, forecloses the Complaint, any dismissal should be without prejudice. Dismissal with prejudice is appropriate only where it is clear that "the complaint could not be saved by amendment." *Eminence Cap., LLC* v. *Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (per curiam). Defendants' sole ground for dismissal with prejudice is that *Assad* makes amendment futile. Dkt. 18 at 14. However, Defendants concede that *Assad* may be vacated, *id.* at 13 n.4, and although the Ninth Circuit has denied rehearing en banc, *Assad* remains subject to Supreme Court review, *see* Part III, *supra*; the regulation on which

---

[6] On November 5, the CFTC issued guidance that "geographic access restrictions" are inconsistent with "impartial access." Christopher J. Kirkpatrick, DCM Impartial Access Requirements, CFTC (Nov. 5, 2026), https://perma.cc/3SJ7-Y47P. Thus, if Novig stops offering sports event contracts in Washington, it risks violating CFTC guidance and potentially jeopardizes its status as a CFTC-approved exchange.



**BRADLEY BERNSTEIN SANDS LLP**
2800 First Avenue, Suite 326
Seattle, WA 98121
Tel: (206) 337-6551

the panel relied is expected to be replaced within weeks, *see* Part II.B, *supra*; and the preemption question is pending before the Supreme Court, *see* Part III, *supra*. A dismissal without prejudice would permit Novig to replead in this action if the Supreme Court or the CFTC alters the governing framework. Defendants' continuing non-enforcement agreements with Crypto.com and Robinhood further undercut any claim of prejudice from permitting Novig to replead.

**B. The Court Should Grant Leave To Amend.**

If the Court concludes that any aspect of the Complaint is deficient, it should grant leave to amend. Leave should be "freely give[n] when justice so requires," Fed. R. Civ. P. 15(a)(2); *Foman* v. *Davis*, 371 U.S. 178, 182 (1962), and dismissal without leave is proper only where amendment would be futile, *Vasquez*, 487 F.3d at 1258. Defendants' futility argument rests entirely on the premise that *Assad* forecloses every version of Novig's claim. Dkt. 18 at 14. For the reasons above, it does not.

Novig could plead substantial additional facts and authority, much of it postdating the Complaint. Those include the following: (1) the IFR and NPRM, of which the Court may take judicial notice, 44 U.S.C. § 1507; (2) the CFTC's final action replacing § 40.11, expected by the end of November 2026; (3) Chapter 14 of Novig's Rulebook and the responsible-trading standards it establishes; (4) Novig's theories under § 1a(47)(A)(i) and (iv), which *Assad* did not address; (5) the CFTC's orders directing a DCM to continue operating and fulfilling trades notwithstanding state-law demands, *Assad* Pet. at 13 n.1; and (6) further facts concerning the structure of Novig's exchange, the hedging uses of its contracts, and the practical impossibility of complying with Washington's categorical prohibition while maintaining a national, impartially accessible market. Each bears directly on the grounds on which *Assad* turned. An amendment incorporating them would not be futile.



**BRADLEY BERNSTEIN SANDS LLP**
2800 First Avenue, Suite 326
Seattle, WA 98121
Tel: (206) 337-6551

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to dismiss. In the alternative, if the Court dismisses the Complaint, it should order that the dismissal is without prejudice and grant Novig leave to file an amended complaint.

DATED this 9th day of November, 2026.

I certify that this memorandum contains 8,183 words, in compliance with the Local Civil Rules.

**BRADLEY BERNSTEIN SANDS LLP**

By: /s/ Heidi Bradley
Heidi Bradley, WSBA No. 35759
2800 First Avenue, Suite 326
Seattle, WA 98121
Telephone: (206) 337-6551
Email: hbradley@bradleybernstein.com

**SULLIVAN & CROMWELL LLP**
Benjamin R. Walker (pro hac vice)
Ann-Elizabeth Ostrager (pro hac vice)
John J. Liolos (pro hac vice)
Jason P. Barnes (pro hac vice)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
Email: walkerb@sullcrom.com
ostragerae@sullcrom.com
liolosj@sullcrom.com
barnesjas@sullcrom.com

Rishabh Bhandari (pro hac vice)
1700 New York Avenue, N.W.
Washington, D.C. 20006
Telephone: (202) 956-7500
Facsimile: (202) 293-6330
Email: bhandarir@sullcrom.com

*Attorneys for Plaintiff Ludlow Exchange, LLC d/b/a Novig*

**CERTIFICATE OF SERVICE**

I certify that on November 9, 2026, I electronically filed the foregoing Plaintiff's Opposition to Defendants' Motion to Dismiss with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

DATED this 9th day of November, 2026.

*/s/ Heidi Bradley*
Heidi Bradley, WSBA No. 35759
*Attorney for Plaintiff Ludlow Exchange, LLC d/b/a Novig*



**BRADLEY BERNSTEIN SANDS LLP**
2800 First Avenue, Suite 326
Seattle, WA 98121
Tel: (206) 337-6551